May it please the court. I am Assistant Federal Public Defender Laura Koenig, and I represent Appellant Francisco Palacios. The District Court erred in this case when it denied the motion to dismiss under 8 U.S.C. Section 1326d. First, Mr. Palacios was not seeking a futility exception, but rather was arguing that his Immigration Council's ineffectiveness deprived him of an proceedings as to Mr. Palacios' challenge to the removal order because of his attorney's ineffectiveness. And second, the District Court erred in denying Mr. Palacios' equal protection challenge to Section 1326. Mr. Palacios presented sufficient evidence to show that racial animus towards Mexican nationals is a motivating factor for Congress to enact the crime of illegal reentry in the Undesirables Act of 1929. The government did not and cannot show otherwise. The later reenactment of the crime in 1952 did nothing to diminish Congress's original discriminatory intent, and the District Court erred when it concluded that the equal protection clause was not violated. Under NOVA review, this court should reverse. Ms. Koenig, can you think of any situation where the Supreme Court or this court have ever held that a facially neutral federal criminal law is unconstitutional because it violates the equal protection clause? I cannot, Your Honor. I had intended to go through the 1326 argument, but because Judge Haytens had started out on the equal protection clause, maybe I'll start there. Feel free to start there. I'm happy to come back to it. No problem. All right. The question the court must answer in the 1326D argument is, did the District Court err in finding that Mr. Palacios sought to apply a futility exception under Section 1326D-2? And that was partially my issue in terms of inartfully using the word futile in the pleadings below. But a futility exception is just an exception to the exhaustion requirement that is simply based on a court's powerlessness to grant to the relief that is sought. So, for example, if a person in removal proceedings was just legally ineligible for relief from removal, there would be no basis on which they could exhaust administrative remedies. And that is the type of circumstance in which someone could seek to argue that there would be a futility exception. And that's not what we were arguing here. Rather, what Mr. Palacios, what we were arguing is that his counsel's ineffectiveness satisfied the requirements to further exhaust any administrative remedies available and deprived him of the opportunity for judicial review. And that's a distinct inquiry from whether or not someone is simply just asking essentially to disregard Sections D-1 and D-2 of Section 1326. And I briefly want to touch on Palomar-Santiago at this point. In the government's 28J letter, they raise the issue of Palomar-Santiago. And I think that the critical point for this court to consider as it relates to Palomar-Santiago is in that case, the defendant there was asking the court to just simply disregard any showing as it related to D-1 and D-2. And that's not what I'm asking the court to do. And that's not what Mendoza-Lopez did. Palomar-Santiago certainly did not overrule Mendoza-Lopez. And what Mendoza-Lopez recognized as it relates to that are sometimes procedural defects that can render unavailable administrative exhaustion and deprive someone of judicial review. And so our argument here is that the ineffective assistance of counsel is what satisfies D-1 and D-2 of 1326 because that operated to deprive Mr. Palacios of judicial review. Ms. Koenig, could you address the First Circuit's decision, which I think I understand your argument. I think it's a good argument. I think I understand how it works. Could you? Judge Lynch was not of the same view as you. So I'd like, could you give you an opportunity to respond to her counter analysis of D-1 and D-2? Yes, Your Honor. And I hate to disregard a Circuit Court judge, but I think that Judge Lynch just got it wrong. I think when, because in Palomar-Santiago's discussion, it uses the word excuse. And again, this is sort of, we're all trying to kind of figure out which language is the best word to use to describe what is actually going on. And in Palomar-Santiago, when the Supreme Court said there is no excusing the elements in D-1 and D-2, I think that that is where the First Circuit and Judge Lynch made the error. Because one way to describe satisfaction of D-1 and D-2 is there is a way to excuse D-1 and D-2, but there still has to be a showing. In Palomar-Santiago, what the defendant there was just saying is, if I can show you that I'm not an aggravated felon, I have no further obligation under D-1 and D-2. And that's not what happened in Mendoza-Lopez, and that's not what we're showing here. We're saying that there would have to be a showing of ineffective assistance of counsel, and the District Court would need to make further findings on that point, and also as to whether or not that effectively deprived Mr. Palacios of the right, the opportunity to judicial review. Counsel, am I right, you're saying, please, you know your case much better than I do, but basically are you saying that there's facial ineffective assistance here because counsel continues to press this, I am an Americanized person, and because I'm Americanized, I'm going to stand out, I'm going to be a target, when there is evidence in this record that his family had already been targeted by the gangs and failed to associate a clear connection with a social group, his family? Is that basically what you're saying? Yes, Your Honor, that is a part of it, because the Immigration Counsel did not present the evidence of the people that were simply waiting in the hallway ready to testify that would provide support for that. But I don't think this court needs to get into that because the District Court just simply made an error of law in its analysis and made no factual findings. It would be more helpful, I think, for this court to review a record in which factual findings were made. But certainly, yes, Chief Judge Gregory, that is a record that exists in this case. Mike, do you agree with me? As I read the District Court, it dismissed solely for failure to satisfy D-2. Is that your reading of the District Court's opinion as well? Yes. Yes, Your Honor. And so the court, this court would need to remand to the District Court for further findings with legal clarification on what the standard is for D-2 as it relates to this case. But for further findings on what the court would find as it relates to D-1 and to D-3. I want to make sure I have enough time to go on to the Equal Protection claim, so I'll move on to that now unless there's further questions about the 13-2060 challenge. Okay, thank you, Your Honor. As it relates to the Equal Protection challenge, I think the court has to answer two questions. First, whether strict scrutiny applies to the Equal Protection challenge in this case. And if so, then did the District Court err in finding that Mr. Palacios failed to show that a discriminatory purpose was a motivating factor in Congress enacting the crime of illegal reentry in the Undesirables Act of 1929? As it relates to the first question, strict scrutiny we know applies when there is proof that racially discriminatory intent purpose exists, and Arlington Heights gives us the framework. The first step is that the challenger must show that proof that a discriminatory purpose was a motivating factor in enacting the law. And if that happens, then there is no longer the presumption of judicial deference to the legislature that would otherwise generally apply. And then the next step is that the burden shifts to the government, that the law's proponent here, the government, to show that Congress would have enacted the same law, even had the impermissible purpose not been considered. And then lastly, if the government cannot show that, which they didn't here, the court would then have to hold the law unconstitutional. And as it relates to the primary point that the government has made, that there is evidence of an economic reason that Congress enacted this. As the Supreme Court has recognized, there is very rarely a single motivating purpose with which Congress acts. And I think our record is replete here of, under the factors that the court considers in Arlington Heights, that this act in particular was motivated by racial discrimination. First, the first factor in Arlington Heights is whether or not the impact of the official action bears more heavily on one race than another. We certainly know that to be true. We know that Congress, at the time that the Undesirables Act was created, the only people that were being deported were Mexicans. I'm not saying, not that there were never any exceptions, but the vast majority of people who were deported, which is a element that that was the basis on which, that was the factual basis there, that Mexican nationals were the ones being deported. And so therefore, we have the sequence of events that leads to the challenge action. We know that there's a history, a nativist movement happening in the United States at that very, very, very clear racial discrimination against people of other races, specifically Mexican nationals. And then the day that the act is passed, Congress people are on the, Congressmen at that time are on the floor of the House saying, you know, Mexicans are poisoning the American citizen because they're a class that's very undesirable. And minutes later, the bill passes the House of Representatives and the president, our president signs it into law three days later. We also know that the relevant legislative or administrative history includes that similar information. And critically here, the government has made no showing at all to combat that. They simply just say, because the evidence that we presented indicated that the law itself was a compromise between the agricultural industry on one hand, that needed growers, and they wanted people who were undocumented aliens from Mexico to be able to come and grow food for the United States. And Congress, on the other hand, that wanted to kick Mexicans out of the country, rather than creating a quota, like they did for every other national, what Congress did in this case was to create a crime and criminally punish someone and essentially bar them from ever being able to enter the United States legally by enacting this law. And so the government made no showing whatsoever that racial discrimination was not a motivating fact. And, and so they have not met their burden. So this court can and should reverse on that point. Miss Kane, can I ask you about something that it feels like is lurking in the background of this case, which is the history you have recited. I don't dispute any of it. It's, it's extremely troubling to modern years. I wish it would have been troubling at the time. This is a federal criminal law that has existed for almost a hundred years, I think. And it seems to me that the argument you're making today would have been available at almost any point during the last. And even if I spot you that modern equal protection doctrine doesn't really exist until the 1960s, fine. I'll spot you that this argument would have been available at any point during the last 60 years. And I don't think it would have been any different doctrinally than it is right now. What do I do with the fact that no one ever appears to have argued this until pretty recently, or at least in cases I've been able to find. Well, you're right. And that's a very, um, that's a good point. Um, you know, sometimes, uh, the legwork is what is needed to be done. I mean, you'll see from the, um, the moat that the evidence that was submitted in the, in the joint appendix that was related to this issue, this required people going to through legislative history, and sometimes criminal defense attorneys, particularly federal public defenders or state defenders don't necessarily have or devote the energy to do that. Um, and so I don't have a good answer because I don't have an answer. I just know that it did require a fair amount of legwork, not much of which was done by myself, um, to, to create this. And, um, and I, I appreciate that. It's something that hopefully will be continued to be brought up as it relates to this. I did just want to touch very briefly on, um, the reenactment in 1952, because that is what the district court relied on. Um, as we've, uh, we've had to get around that reenactment in 1952, you're talking about everything that's 52. It was reenacted Judge King in 1952. But as we've given the judge, Judge Gibney thought highly of that point, didn't he? Did your honor. And what he focused on is that there was a reenactment and he relied on a case United States versus price, which said that the views of the subsequent Congress form a hazardous basis for inferring the intent of an earlier one. But that, uh, misplaced or misunderstood what price was saying. Price was looking at the actions of a, of a later Congress when the one that was at dispute was an earlier one. Um, that's not coming out the right way, but, um, but we have here, um, there is, as the Supreme court has noted, um, for a hundred years, if I can briefly finish my answer, your from one reenactment to another, and there are no substantive changes in the law that the court must, this court must presume the intent remains the same. And, uh, and we have that, that evidence here. We don't have that evidence here that there was a change. Congress could easily have fixed this, but they made no record to do so. Thank you. Thank you. Uh, so yes. Thank you. Judge challenge. And our threshold argument here is that the defendants equal protection challenge should be assessed under the rubric of rational basis review. As the court knows the Supreme court and this court regularly assess immigration related laws under the rubric of rational basis review. And the reasons that dictate that narrow or deferential standard of review don't go away when Congress passes a criminal law. In our view, 1326 is rationally related to the government's undeniably legitimate interest in preventing illegal reentrance from the country. That view is supported by cases. For example, the ninth circuits case in Hernandez Guerrero, which is cited in our brief, which holds that 1326 is a necessary piece of our country's immigration architecture. And without it, our immigration laws would be all bark and no bite. That's the quote from the ninth circuit and Congress, even as far back as 1929, as the Senate report from the 1920 shows saw itself as addressing the problem of repeat reentrance and under rational basis review, the inquiry should end there. Well, can I ask you about that? The problem is under rational basis review. We don't care what reasons people actually gave. We only care if we can hypothesize a reason. And so let me ask you, so are you really saying that if Congress passed a law kind of like this, that on the text of the law was facially discriminatory based on race, that we would apply rational basis review and uphold it because we can hypothesize a reason that's different than the one that's literally in the text of the law? I mean, that seems the logical implication of your claim that rational basis review would apply. Sure. So number one, just to go back to the Arlington Heights, we wouldn't need Arlington Heights in that situation because we would have a law that discriminates on the basis of race. But anyway, I don't think we'd be applying rational basis review if we had a law that discriminated on the basis of race. And then, of course, we'd need to know the purpose of the law. And we know from. Okay, so then your argument is we apply rational basis review so long as the law is facially neutral. That's the position the government's arguing for. So Arlington Heights usually comes into play when you have a facially neutral law and you need to then go into the, you know, go into the depths of the law. But a law that your honor is suggesting, a law that discriminates on the basis of race is unlikely to pass rational basis review because laws that categorize on the basis of race or ethnicity or religion, as we know from cases like City of Clinton. Oh, no, no. I'm sorry. Let me imagine. I can hypothesize this law pretty easily. What if this law had a series of findings of fact, statements of congressional purpose, wherein Congress wants to end the scourge of racially derogatory term for Mexican Americans? We thus for that reason, and Congress says in the text of the law, this is the reason we're doing it. We enact this statute. Would your argument be the same, then? This is an image. I'm sorry. Just to ask about this. Sorry. That's a bad hype. Let me imagine that the text of everything about this same law is exactly the same. But it's accompanied by a statement of purpose and the statement of purposes resolved to end the scourge of racially derogatory term for what for Mexican Americans. Congress enacts the following law. Sure. And it says in the text of the law, that's why Congress is doing it. Sure. So a few responses. My main response is that rational basis review is not of the Supreme Court, for example. Basically, courts are not are not obligated to blindly accept an asserted rationale that's not actually advanced by the statute, whatever the purpose of the statute would be. And I think the Supreme Court's decision in Trump versus Hawaii is a good example. The three cases that the Supreme Court cites are Romer versus Evans, city of Cleveland, Texas, and Department of Agriculture versus Moreno. There are three cases where the no, no, no. There's clearly something more sinister going on here. And the purpose of the law is just not the stated purpose of the law is not further at all by whatever Congress says they're trying to achieve by that law. My third response is that even in the immigration context, where courts have been wide latitude to Congress and the executive from deferential review to even no review at all in certain cases, the Supreme Court has declined to rule out the possibility. And this is Reno versus American Arab Anti-Discrimination Committee. The possibility of an outrageous case or where the alleged basis of discrimination is so outrageous that that general rule of deference basically just falls away. I don't know if we have that case yet, if we've seen that actually put into play, but that would be the type of situation, I think, where outrageousness review or the possibility of outrageousness review that the we also have a good example in Trump versus Hawaii and this court's post-Trump case in IRAC versus Trump, the 2020 decision where the Supreme Court applies rational basis review in a way that accommodates sort of incorporates some of the concerns that I think the court might have. And the question just mapping on Trump's rational basis inquiry to here, and it's not a perfect fit, but just to map it on is number one, whether 1326 is rationally related to the government's interest in protecting against a legal re-entry and whether or not withstanding the statements of some legislators, assuming legislators, assuming they existed as to the actual challenge to act, which they don't here 1952 and beyond, but whether or not withstanding those statements, it can reasonably be understood the law to result from a justification independent of the unconstitutional ground. So there is in the law, a rational basis, call it an amped up rational basis, but a rational basis review that does accommodate some of your honors concerns. But just to get to the second part of the argument, which is the Arlington Heights inquiry, even if the court accepts that Arlington Heights is the right framework, or just assumes for the purposes of argument that Arlington Heights is the way to decide this case, it would hardly move the needle for the defendant's challenge. And on this point, we're really guided by two controlling cases. The first is Abbott and the second is Raymond. And Abbott teaches us three key things, three key principles that guide us in deciding this question. The first is that legislators are entitled to a presumption of good faith. The second is that even a finding of past discrimination doesn't flip the burden of proof. And the third is that in any challenge like this, a sort of unique challenge where we're dealing with a progenitor law, the critical focus has to be on whether discrimination is proven in the given case, not in 1929, but in the actual statute that matters, which is 1326 as passed in 1952 and amended repeatedly since. And in Raymond, this court put into action Abbott's principles in a situation similar, not identical, but similar to ours, where a later in time legislature reenacted a law that this court had previously struck down as discriminatory and unconstitutional. And as applied to this case, the import of both Abbott and Raymond is really clear. Even if the court assumes for the purposes of argument that the 1929 law was passed entirely to discriminate against Hispanics, that doesn't do anything to prove discrimination as far as the 1952 law, because the defendant's historical evidence is almost exclusively focused on the 1920s, 1924 to 1929. And the defendant has made no showing that Congress in 1952 or beyond passed 1326, then section 276 for discriminatory purposes. Well, I mean, there is President Truman's veto and his explanation for why he vetoed the later law, right? What do you do with that? Sure. Two responses. Number one, Truman is not a about the law, good or bad. He should be treated more of a supporter or an opponent of the law. But that's my legal answer. My historical factual answer is that I'm a little surprised the executive branch is taking the position that the president's views are irrelevant. I didn't say irrelevant, but they're not relevant as insofar as Congress's motives for passing the law are concerned. So that's my legal answer. My historical answer is that there is no evidence, and even the court in Carrillo Lopez noted this, that President Truman vetoed the INA because of 1326. All the history indicates that President Truman vetoed the INA because of his opposition to the national origins quota laws. That's what all of the debate was about around that time. And even the opposition in Congress led by Senators Humphrey and Lehman, these are Truman supporters who were vehemently against the INA and voted against the INA. Their competing bill, which didn't include national origins quotas, but their competing bill had its own 1326, which is identical to the 1326 that Congress passed in 1952. So that would be my response, Judge Haydens. I want to point out why this case is even easier than Raymond. In Raymond, there were maybe five years, there was something like five years in between the later in time legislature reenacting the voter ID provision that this court had struck down. Here, of course, we have over 20 years. And in Raymond, and this is one of the concerns of the district court in Raymond, which is a fair concern, the legislature was substantially the legislative leaders. Here, as Judge Gibney pointed out, there's a 96% turnover. So we're not even dealing with a situation like Raymond. Just to sort of cap everything off, if you really get to the core of the defendant's equal protection theory and the theory that I think the defendant is urging this court to adopt, it's really a theory that Abbott and Raymond have already rejected. The critical error in Abbott was that the district court put the onus on the law's defender to show that the later in time legislature had cleansed or cleansed the taint of the prior discriminatory redistricting plan. And to show that the later in time legislature had a, quote, true change of heart, I would claim that the court used there. And in Raymond, it was the same, the district court put the onus on the law's defender there in North Carolina to show that the later in time legislature, quote, purged the taint. And if you get to the... Can I ask you just, I would only say, I mean, aren't there recent Supreme Court decisions that call that into question? I mean, doesn't Ramos call that into... I mean, the Supreme Court has had some cases recently about this same broad issue. And they, in fairness, the Supreme Court recently has seemed to suggest just reenacting something doesn't make the bad thing go away. I think the court said that in Ramos. They've said that in some of the establishment clause cases, the baby Blaine Amendment cases. What do I do with those cases? So I don't... Ramos and Espinoza of Montana case, I don't... First of all, those are not equal protection cases. And they didn't hinge on looking at a progenitor law as barren on whether we could decide whether a later in time legislature was motivated by the same sorts of animus. So that's number one. But number two, and I don't... And first of all, I think Abbott is the most on point decision that deals with the situation. And then Raymond's application of Abbott is pretty much on all fours with this case. So I don't read either of those cases to require some kind of amendment or a requirement for a later in time legislator to amend the statute to sort of purge the taint. But even if there were such a requirement, we would have satisfied that here. And we've listed a few of the reasons, a few of the ways that 1326 is different from the 1929 law, but I'll just list a few more now. Number one, in 1952, Congress included the founding clause. That's a substantive change that expanded the scope of liability, basically making 1326 a continuing offense until you are found in the country. This court in Alhambra pointed that out. In 1952, Congress struck the impersuance of the law phrase. That's a phrase that in Mendoza-Lopez, the Supreme Court identified as a possible textual hook for the due process right that it would later identify and that would be codified in 1326D. In 1952, Congress merged all three of the prior illegal re-entry provisions into one provision. That's with one penalty. That's a substantive change. That's not a copy and paste type of thing that Congress is doing in 1952. Congress also added a defense in 1952 that was not present in 1929, and that's now in 1326A to Big B. Congress also expanded the law to reach those who were excluded and deported, not just arrested and deported, and it also defined the word enter in the definition sections. So this is not the same law, and this isn't a scientific way of proving it, Your Honor, but if you look at 1929 illegal re-entry law, it's about this big. And one more just historical point I want to point out is that the 1929 law is not called the Undesirable Aliens Act of 1929. It was never called that. A more expansive provision was introduced by the House to the Senate's more streamlined illegal re-entry provision. That provision included seven, later eight, categories of deportable aliens that the House wanted to basically tack on to the Senate's very narrow illegal re-entry bill. Section 10 of the bill proposed the name, and this was actually called the Undesirable Aliens Act of 1929. The Senate rejected most of the House's proposals, including its name, and the House receded from that. So the law has never been called the Undesirable Aliens Act of 1929. You will see that. Can I take you to the threshold question, the 1326 question? I just want to make sure I understand what the government is currently arguing he should have done to satisfy D1. So am I correct? So he gets a criminal lawyer, and the criminal lawyer looks at his immigration proceeding and is like, wow, I have no idea why this was entered because it never should have been entered because your immigration attorney did a terrible job. Is the government's view before this court that what Ms. Koenig's colleagues should have then done is to file, I guess, ask the district court to stay the criminal case so that they can file a motion to reopen under Lozada? Is that what the government thinks the criminal lawyer should have done in this situation? No, that's not our position. Our position is that under Palomar Santiago, when administrative avenues for relief exist to fix the error, that's the phrase the Supreme Court uses, Alien has to take them, and he's not excused at the time. So the defendant claimed, the defendant believed he had a viable and effective assistance counsel claim. He should have moved under matter of Lozada and actually- Well, but that, I mean, that's maybe a matter of forfeiture, but it's not a matter of exhaustion. A matter of exhaustion is just presenting it to the agency at some point, right? So you can, think about 2254, you can exhaust before the state, even if you do it in a way that's untimely and thus forfeited. And then when you go to federal court in your 2254, we don't say it's not exhausted. We might say it's procedurally defaulted, but not that it's not exhausted. So wait, so, okay. So I presume if Ms. Koenig's colleague had said, let's continue this criminal case so that I can go file a motion under Lozada to reopen and thus exhaust, and thus in the government's view, satisfy D1, my suspicion is that you would have opposed that. Is that a fair suspicion? That's an interesting question, Your Honor. I hadn't thought about that. I don't know if we would have opposed it. I've never seen that happen. And the reason why is because I don't, at this point, several years after the IJ hearing for that, I'm not sure the defendant could have moved to reopen under Lozada. Well, wait, the government's brief tells me, look, the BIA is always open to arguing that these deadlines should have been equitably told until you realize the thing. And here are the answers. I mean, sincerely, let's hypothesize that his immigration attorney, I don't know this person, I don't know their circumstances, but just did an objectively wretched job. Just imagine that for the sake of argument. And then he doesn't have that attorney, and it's not until he's tried with a criminal offense, he has a right to counsel under Gideon and his public defender doing exactly what they should be doing, takes a look at the immigration proceeding and says, this is complete garbage. You had horrible legal representation. You were obviously not eligible to be removed in the first place. And then he goes back to Lozada and he or she goes back to Lozada. That would exhaust it, wouldn't it, even under the government's conception? I think it would. I mean, motions to reopen can be filed. There's definitely, at any time, if you're removing an absentia, there's definitely equitable tolling. If a defendant qualified for that, then I don't think that would be unreasonable. I can't tell you what the government would do in every case. And I don't know what we would have done here, but that's an interesting point. Sir, isn't part of the reason that we don't know what would have happened here is that, as I read the record, the government never argued to the district court that he failed to exhaust because he hadn't complied with Lozada. I think the first time the government ever argued that was before this court. That's correct. That's correct. The defendant hasn't argued that we waived that issue. And as the court is aware, this court can affirm on any basis in the record. We're making that argument now. Of course, there's precedent. First of all, the defendant has to satisfy all the prongs of 13-2016. If he fails at any point, then his claim is collateral challenge. But can I ask, just to confirm my understanding that I also did with your colleague, I read the district court's opinion in this case to be based exclusively on a conclusion that he did not satisfy D2. Is that your reading of the district court's opinion? Sure. And then the to that effect stating that because I'm deciding the case on D2, I don't need to go to the other prongs. Sure. That is the district court's view, I think also. Just to tie things up with the one minute that I have left, regardless of what the court thinks... Before you tie it up, make sure about the D2 in terms of not reaching one and three. And that is not, of course, coming to this court, for example, to appeal the decision. But if your lawyer has been so ineffective that you didn't raise those questions in terms of the proper social group or social group at all, well, wouldn't you, in effect, it's almost like not to count a futile in terms of what was talked about in distinction. But it is, on the record, you've forfeited those things, haven't you? Because then it comes before we can't... We'd have to review it based on what was presented. But it was never a proper presentation on that social group or family at all. It was only on the Americanization and those type things. So isn't it way in that? So it's beyond just D2. Don't you have to look at that in effective assistance counsel when that really is the nub of the problem? Sure. So the defendant's futility argument is belied by the defendant's own conduct. If it was futile to argue for family-based persecution, then the defendant wouldn't have appealed to the BIA on exactly that ground. The defendant argued and took three or four pages of his brief to the BIA, citing all of this court's relevant family and kinship cases, saying that the IJ, there it was the IJ's fault, here it becomes Juan Ruiz's fault. But at the time, it was the IJ's fault. It was the IJ that had failed to account for an alternative basis for relief, their family-based persecution. If it was futile to seek further relief, then it would have been futile to go from the IJ to the BIA. So I don't think that argument really stands up. And whatever the court thinks of a defendant's ability to excuse compliance with D1 or D2, at the end of the day, the court has to answer the question of whether the defendant should be excused, which is a legal and a factual question. Even assuming that the defendant is, that there exists in the post-Palomar Santiago world, situations where a defendant can be excused from D1 or D2, the defendant's theory is that he would have been excused or should be excused because Juan Ruiz was ineffective. And for all the reasons we stated in our brief, and I see, Your Honor, I'm a minute and a half over time. For all the reasons we've stated in our brief, we don't think that that claim holds up. And the defendant, at the end of the day, has to be able to show prejudice. And on this record, he cannot do that. All right. Thank you very much. Thank you, Your Honor. Ms. Kay, do you have some time reserved? Thank you, Your Honor. Just a few brief points in response. As it relates to the equal protection challenge, as we've noted, you know, and the Supreme Court has observed in Regents, immigration law can still be subject to strict scrutiny where there is proof of racial discrimination as there is here. Second, as it relates to the Trump case that the government attorney cited in its brief and today, that was an analysis of the civil law. And as we've noted on pages 16 and 17 of our reply brief, the Supreme Court has found that sometimes a law that or a practice or procedure that may satisfy a civil standard may not still pass muster when criminal punishments are attached as they are here. As it relates to the Abbott and Raymond cases, as we've noted in our briefing, those are different cases because there were significant intervening events that are not present here in the record. First, in the Raymond case, voters had approved a statewide referendum that constitutionally required the North Carolina legislature to enact a voter identification law. And that was the basis of the later enactment that was subject to challenge in that case. And in Abbott, the Texas court had drafted redistricting plans at the instruction of the Supreme Court. And those significant intervening events, there's no evidence of that here. And as it relates to the government's argument about the found in portion that was added in 1952, the government attorney cited the case on release that this court has found that that is not a new element, it is simply just a conclusion of the reentry element. So the elements remain the same, the punishment remained the same, there were no substantive additions. And the evidence that we do have in this record about the 1952 reenactment does nothing to diminish a finding of racial discrimination. We know that when the 1952 law was passed, it was enforced via a an operation called Operation wetback. The names in this case are eye catching and not certainly in a racially neutral way. As it relates to the motion to reopen that I think the court just doesn't need to engage in that at this point, because it really is a purview of the district court to make factual findings as to whether or not such an administrative remedy would have been available to Mr. Palacios at any time that that he could have pursued that. And so in conclusion, the district court just missed the mark on the legal analysis and Mr. Palacios, the section 13 2060 claim. And this court should remand on that issue for findings of fact, with clarifications of the law from this court. And as it relates to the equal protection challenge, the district court erroneously reviewed this case for rational basis and misapplied Arlington Heights. Mr. Palacios did prove that racial discrimination was a motivating motivating factor, and the government did not respond with any evidence showing that but for another reason, without consideration of the discrimination that Congress would have enacted the same crime. And so this court should reverse the district court on that issue. Thank you. Thank you so much. Thank both of counsel for your arguments here. And we would love to come down and greet you as we normally do in our tradition, but we cannot. But please know that we very much appreciate your being here and your arguments and wish you well, be safe and stay well. Thank you. Thank you, counsel.
judges: Roger L. Gregory, Robert B. King, Toby J. Heytens